Case No. 5:16-cv-00629-F

---

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

---

| | | |
|---|---|---|
| **CHRISTOPHER L. STIEBENS and** | ) | |
| **MARY E. STIEBENS.** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:16-cv00629-F** |
| | ) | |
| **RESILITE SPORTS PRODUCTS,** | ) | |
| **INC. and LEON M. STAUFFER,** | ) | |
| **Defendants.** | ) | |

---

*PLAINTIFF'S OBJECTIONS TO AND MOTION TO EXCLUDE TESTIMONY OF*
*DEFENDANTS' DESIGNATED EXPERTS,*
*DR. LISA GWIN, ENRIQUE BONUGLI & DR. CYNTHIA DAY*

---

**THE NIX LAW FIRM**
*/s/ David M. Nix*
**DAVID M. NIX, OBA # 14784**
**1401 Holliday, Suite 400**
**Wichita Falls, TX 76301**
**Tel: (940) 322-8200**
**Fax: (940) 228-3233**
**dnix@thenixlawfirm.com**

**Attorneys for Plaintiffs**

August 1, 2018

## TABLE OF AUTHORITIES

**CASES:**

*Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp.2d 1310 (N.D. Okla. 2000) ......9

*Alfred v. Caterpillar, Inc.*, 262 F.3d 1083 (10th Cir. 2001)………………………. 9

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).......................................2,3,4,8,9,10,16,19,20,22,24,25

*Dodge v. Cotter Corp.*, 328 F.3d 1212 (10th Cir. 2003) .......................................10

*Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413
    (W.D.N.Y. 2005)…………………………………………………………..11

*E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).. 12

*Frase v. Henry*, 444 F.2d 1228 (10th Cir. 1971)…………………………………….. 4

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......................................................10

*Goebel v. Denver and Rio Grande Western Railroad Co.*,
    346 F.3d 987 (10th Cir. 2003) ....................................................................10

*Guentzel v. Toyota Motor Corp.*, 768 S.W.2d 890 (Tex. Ct. App. 1989),
    writ denied (Sept. 13, 1989)……………………………………………… 12

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..............................3,20,24,25

*McCollin v. Synthes Inc.*, 50 F. Supp. 2d 1119 (D. Utah)………………… ..........20

*Mitchell v. Gencorp Inc.*, 165 F.3d 778 (10th Cir. 1999) ......................................10

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998)…………… .......10

*O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376 (C.D. Ill. 1992),
    aff'd, 13 F.3d 1090 (7th Cir. 1994)……………………………………………8

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001)..............9

*Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19 (1st Cir. 1992)…..8

*Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299 (6th Cir. 1997)………………………9

*Tuato v. Brown,* 85 Fed. Appx. 674 (10th Cir. 2003)……………………………11

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999)………….. ........19

*Wilson v. Muckala*, 303 F.3d 1207(10th Cir. 2002)……………………………… .4

*Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643 (10th Cir. 1991)………………..4

## **STATUTES:**

Fed. R. Evid. 702 ...................................................................3,8,10,24,25

Fed. R. Evid. 703……………………………………………………………….. 3

59 O.S. §10-475.1, et. seq……………………………………………………...6

## TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ..........................................................1

ARGUMENTS AND AUTHORITIES ..................................................................2

ADMISSIBILITY STANDARDS: *DAUBERT* & RULE 702.......................2

SUMMARY OF DEFENSE EXPERT OPINIONS…………………….......4

I.  LISA GWIN………………………………………………….................4

A. GWIN IS NOT QUALIFIED TO RENDER THE OPINIONS SOUGHT
BY THE DEFENSE………………………………………………..5

1) GWIN'S "ENGINEERING" AND/OR "BIOMECHANICAL" OPINIONS……...6

2) GWIN'S MEDICAL OPINIONS…………………………………… ..7

B. GWIN'S OPINIONS ARE SPECULATIVE AND UNRELIABLE……….10

1) GWIN'S "ENGINEERING" AND/OR "BIOMECHANICAL" OPINIONS… ..11

2) GWIN'S MEDICAL OPINION……………………………………….15

C. GWIN'S OPINIONS REGARDING MEDICAL IMAGING ARE
CUMULATIVE……………………………………………………16

II. CYNTHIA DAY………………………………………………….17

A. DAY'S OPINIONS REGARDING MEDICAL IMAGING ARE
CUMULATIVE…………………………………………………..17

B. DAY IS NOT QUALIFIED TO RENDER THE OPINIONS SOUGHT
BY THE DEFENSE………………………………………………… 17

C. DAY'S OPINIONS ARE SPECULATIVE AND UNRELIABLE……….18

III. ENRIQUE BONUGLI………………………………………………….20

A. BONUGLI IS NOT QUALIFIED TO RENDER THE OPINIONS
SOUGHT BY THE DEFENSE……………………………… .......20

**B.   BONUGLI'S OPINIONS ARE SPECULATIVE AND UNRELIABLE**.... 21

**CONCLUSION** ........................................................................24

**PLAINTIFF'S EXHIBITS 1-9** ……………………………………………...27

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CHRISTOPHER L. STIEBENS and** | § | |
| **MARY E. STIEBENS,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 5:16-cv-00629-F** |
| | § | |
| **RESILITE SPORTS PRODUCTS, INC.** | § | |
| **and LEON M. STAUFFER,** | § | |
| **Defendants.** | § | |

**PLAINTIFFS' OBJECTIONS TO AND MOTION TO EXCLUDE
TESTIMONY OF DEFENDANTS' DESIGNATED EXPERTS,
DR LISA GWIN, ENRIQUE BONUGLI & DR. CYNTHIA DAY**

COME NOW, Plaintiffs Christopher Stiebens and Mary Stiebens, and respectfully request the Court to enter an Order prohibiting Defendants, Resilite Sports Products, Inc. and Leon Stauffer, from soliciting testimony and opinions from Defendants' designated expert witnesses-in-chief: Dr. Lisa P. Gwin, Enrique Bonugli, Dr. Cynthia M. Day, all employees of the firm Biodynamic Research Corporation (BRC). In support hereof, Plaintiffs submit the following:

**INTRODUCTION**

This lawsuit arises out of a chain-collision occurring on the Turner Turnpike near Stroud, Oklahoma on June 19, 2014. Plaintiff Mary Stiebens was travelling eastbound in the inside lane of I-44 in her 2011 Honda CRV, with her husband, Plaintiff Christopher Stiebens, sitting in the front passenger seat.  A vehicle driven by Chad Johnson was travelling in the inside lane of I-44 behind the Steibens' vehicle. Directly behind Mr. Johnson, Defendant Stauffer was operating a 2009 Volvo tractor-trailer, owned by Defendant Resilite Sports Products, Inc. Plaintiffs, followed by Mr. Johnson, slowed for congested traffic. Defendant Stauffer did not slow his tractor-trailer and negligently struck Mr. Johnson's vehicle from the rear, forcing Johnson's vehicle into a rear-

end collision with Plaintiffs' vehicle. As a result of said collision, Plaintiffs suffered injuries and harm for which they seek recovery.

## BRIEF IN SUPPORT

In an attempt to disprove the medical causation of these injuries, Defendants intend to offer the medical/biomechanical testimony of Dr. Lisa Gwin (Gwin) a former rural emergency physician and former "test engineer/fuel systems development engineer" for Ford Motor Company; Dr. Cynthia Day (Day), BRC's radiology consultant, and Mr. Enrique Bonugli (Bonugli), put forth as Defendants' accident reconstructionist/biomechanical expert.   Gwin, Day, and Bonugli are employed by Biodynamic Research Corporation (BRC).

BRC is a Texas-based biomechanical and injury causation consulting firm that provides testimony almost exclusively for insurance companies, auto manufacturers, and defense firms in personal injury and product liability cases. BRC offers its services in the analysis of the human body's response to forces or other potentially harmful factors, in order to determine "*if* and/or how an injury occurred." (emphasis added). *See,* BRC website at www.brconline.com/services. BRC is devoted neither to independent research, nor to independent scientific testing, but rather to providing paid testimony for any defendant willing to pay their price.  In fact, BRC experts have frequently been struck by numerous courts under *Daubert* and its progeny, due not only to their lack of qualifications and unreliability, but also their blatant and obvious bias. [*See,* Summary, attached hereto as Exhibit 1].

## ARGUMENT AND AUTHORITIES

## ADMISSABILITY STANDARDS

Admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Additionally, expert testimony must be both relevant and reliable to be admissible. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 594-95 (1993).  It is well established that the role of the District Court is to act as "gatekeeper" to ensure that the proffered expert testimony meets the necessary requirements. *Daubert*, 509 U.S. at 589. *Daubert* articulated a test for admissibility of expert testimony that was designed to exclude junk science:  In addition to determining that the expert testimony is both "relevant" and "reliable," the District Court must determine that the expert is expressing more than a subjective belief or unsupported opinion, and that the testimony has a "reliable basis in the knowledge and experience of his discipline," *Id*. at 589-90, 592. This gatekeeping function has been expanded beyond "scientific" into all areas of expert knowledge. *Kumho Tire, Inc. v. Carmichael*, 526 U.S. 137, 141 (1999) (expanding *Daubert* to expert testimony based on "technical" and "other specialized knowledge"). The Court has "broad latitude" in deciding how to determine reliability and is not required to strictly apply *Daubert's* list of specific factors. *Kumho*, 526 U.S. at 141-142.

Federal Rule of Evidence 703 indicates that an expert witness may base an opinion on facts or data of which he has been made aware or personally observed. (S)he may rely on facts or data supplied him/her by another, only if "of a type ***reasonably relied upon*** by experts in the particular

field." (emphasis added). *Daubert* has left it to the Court to determine that the expert is expressing more than a subjective belief or unsupported opinion. The data upon which such expert opinion is rendered, must be ***relevant, reliable <u>and</u> reasonably relied upon***. Under *Daubert* and its progeny, in deciding whether an expert's opinion is reliable, the Court need not concern itself with whether the opinion is correct, but rather simply to determine whether the opinion rests upon a reliable foundation, as opposed to unsupported speculation.

Finally, the 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact. *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002). *See also*, *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). Expert testimony is not meant to substitute the role of a jury capable of understanding the evidence and having the ability to draw conclusions on its own. *See*, *Frase v. Henry*, 444 F.2d 1228, 1231 (10th Cir. 1971)("When the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper.").

<u>SUMMARY OF DEFENSE EXPERT OPINIONS</u>

## I.    LISA GWIN:

The defense has identified Lisa Gwin, D.O., B.S.E.E., an employee-owner of BRC, as their medical/biomechanical expert. Gwin has been hired to testify regarding her opinions concerning the "injury mechanisms and injury causation involved in this incident based upon a biomechanical assessment of the incident scenario." [Gwin Report, attached hereto as Exhibit 2, at 1]. Ultimately, Gwin intends to testify that the "risk of injury at the delta-V the Stiebenses experienced was negligible" and the "subject impact was minor, and would not be expected to cause any injury." [Exhibit 2, at 11 and 16].  She has, in essence, been hired to testify that the motor vehicle collision

was so minor it would not have caused injury to either Chris or Mary Stiebens. At best, Gwin is invading the province of the jury by substituting her subjective, biased interpretation of the evidence for that of the jury and, at worst, practicing junk science to improperly influence the outcome of this litigation. ***Furthermore, by the date of filing of this Motion, Defendants' counsel has failed to provide Plaintiffs with copies of the exhibits identified in Dr. Gwin's Report and upon which she bases her opinion testimony.***

### A.  GWIN IS NOT QUALIFIED TO RENDER THE OPINIONS SOUGHT BY THE DEFENSE.

Lisa Gwin holds no degree or professional license in either mechanical or biomechanical engineering. Gwin is currently on her fourth career in the thirty-one years since her undergraduate graduation. Gwin earned a B.S. in electrical engineering, <u>not mechanical engineering</u> in 1987 and went to work for Ford Motor Company for six years as a "test engineer" and "fuel systems development engineer," never completing the requirements for professional licensure in any area of engineering. In 1995, Gwin earned a B.S. in Nursing and worked as an emergency nurse for seven years in several rural emergency rooms in Arizona. After her short nursing career, Gwin enrolled in a new medical school (unaccredited from 1995-2000), completing her medical degree in 2003. Gwin then completed her residency in emergency medicine and worked for the next several years as a *locum tenens* ("temp") emergency physician in mostly small, rural or Indian Health Service facilities and was employed as an emergency physician in a small Wyoming hospital from 2006-2012. It was not until 2012 that Gwin self-determined that she would be a "biomechanical expert." [Gwin c.v., attached hereto as Exhibit 3]. From this point forward, Gwin and her employer, BRC,  have touted her expertise in the field of biomechanics, despite her clear lack of any expertise in either engineering or biomechanical engineering.

1) **Gwin's "engineering" and/or "biomechanical" opinions:**

According to BRC's own website, "*Biomechanics (or biomechanical engineering) is the application of physics and mechanical engineering to the human body.*" (emphasis added). *See,* BRC website at www.brconline.com/services. In other words, the study of the effects of forces and accelerations on the human body. A medical/biomechanical analysis of the type Dr. Gwin has been hired to provide actually involves a combination of evaluations performed in several scientific disciplines including accident reconstruction, vehicle dynamics and occupant kinematics, biomechanics, and medical analysis. Gwin, however, is not a licensed Professional Engineer, mechanical engineer, or biomechanical engineer, yet she attempts to use the fields of engineering and biomechanical engineering, to perform tests and analyses, including exemplar surrogate demonstrations and occupant kinematics, to determine the likelihood of injury in a crash similar to the subject incident. [Exhibit 2, at 6-7].

The fact that a witness holds a bachelor's degree in engineering does not make that person an "engineer" under Oklahoma law. In fact, Title 59 of the Oklahoma Statutes requires a person to be a *licensed* engineer in order to perform any type of engineering work, *including offering expert opinion testimony*. (emphasis added).[1]

Gwin has apparently learned from those BRC experts who have been stricken by courts before her, to carefully refrain from holding herself out as an engineer, and only certifies her

---

[1] 59 O.S. §10-475.1 (It shall be unlawful to practice or offer to practice engineering or land surveying in this state...that any person is an engineer, professional engineer, professional structural engineer, land surveyor or professional land surveyor, unless such person has been *duly licensed* or authorized under the provisions of Section 475.1 et seq. of this title..) [emphasis added]; 59 O.S. §10-475.2 ("Engineer" means a person who, by reason of special knowledge and use of the mathematical, physical and engineering sciences and the principles and methods of engineering analysis and design, acquired by engineering education and engineering experience, is qualified, *after meeting the requirements of Section 475.1 et seq. of this title and the regulations issued by the Board pursuant thereto*, to engage in the practice of engineering) [emphasis added]; 59 O.S. §10-475.2(5) ("Practice of engineering" includes "engineering reports or like material developed in connection with *expert witness testimony or anticipated testimony…*" Further, "*a person or entity shall be construed to practice or offer to practice engineering*, within the meaning and intent of Section 475.1 et seq. of this title *who does any of the following: practices any branch of the profession of engineering*; by verbal claim, sign, advertisement, letterhead, card or any other way *represents such person as a professional engineer or through the use of some other title implies that any person is a professional engineer or is licensed or qualified under Section 475.1 et seq. of this title*; **or who** *represents qualifications or ability to perform or does practice engineering*"[emphasis added].

medical/biomechanical report to a reasonable degree of medical and "scientific" certainty. However, vaguely cloaking biomechanical opinions as "scientific" rather than "engineering" testimony, does not make it any less so. Dr. Gwin performs tests and calculations and offers her opinions as a biomechanical engineer, which she most certainly is not.

Accordingly, Gwin, with a B.S.E.E. degree, who does not possess the mandatory requirements for professional licensure, is not qualified to testify in this matter as an expert in any branch of the profession of engineering, including biomechanics/biomechanical engineering. Thus, any opinion rooted in any aspect of engineering or biomechanical engineering should be excluded.

### 2)  Gwin's medical opinions:

Gwin is qualified to testify as a medical doctor, but to only a certain point.  She is not a physician who specializes in spinal injuries, the Stiebens' chief injuries, and thus she is not qualified to testify about such matters.  Mere experience as a physician does not automatically cloak said person with expert status.  In fact, Gwin is board-certified in emergency medicine alone. [Exhibit 3, at 3].  Gwin is not and has never been board-certified as a radiologist, neurologist, neuroradiologist, or orthopedic surgeon, or in any other medical specialty relevant to this matter. [*Id*.].  Gwin has spent her medical career in emergency rooms: first as an emergency nurse, and later as an emergency physician for several years, where she undoubtedly crossed paths with patients suffering from a variety of acute, traumatic injuries. However, Gwin's experience in countless rural hospitals does not automatically convey expertise in either biomechanics or orthopedics, or any medical specialty relevant to this matter.

Gwin is not a radiologist, orthopedic spine surgeon, neurologist, or neurosurgeon yet, with only partial medical records and deposition transcripts, she doubts Chris Stiebens' neck and back

injuries, decides that her tests and calculations show he would not have been injured, and implies his subsequent spinal surgeries were wholly unnecessary. [Exhibit 2, at 7]. She adopts and regurgitates Day's interpretation that Chris Stiebens' imaging reports fail to demonstrate any acute, traumatic injury as a result of this accident. [Exhibit 2, at 6].

Without benefit of Mary Stiebens' imaging reports, Gwin summarily concludes Mary also wouldn't have been injured in the wreck because "net spinal motion was within physiologic limits" and "no evidence of acute injury was demonstrated in their medical records, including imaging studies." [Exhibit 2, at 7].

Courts have uniformly held that Rule 702 and *Daubert* require that the area of the witnesses competence match the subject matter of the witnesses testimony.   A court should exclude the testimony of an expert witness who is not qualified to testify in a particular field.  Because of the increasing specialization of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question.  *See, O'Conner v. Commonwealth Edison Co*., 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), aff'd, 13 F.3d 1090 (7th Cir. 1994).  The proponent still has the burden to show that the expert possesses special knowledge as to the very matter on which he proposes to give an opinion.  Thus a witness' knowledge, skill, experience, training, or education must be separately examined in the light of the precise opinion in question.  *See also, Richmond Steel Inc. v. Puerto Rican Am. Ins. Co*., 954 F.2d 19, 22(1st Cir. 1992)( finding no error in excluding testimony of CPA who had not dealt with a similar sized business in the past 10 years).  Accordingly, a court must not examine the "qualifications of a witness in the abstract, but [must, instead, look at] whether those qualifications provide a foundation for a witness to answer a specific question. The trial court must determine whether the expert's training and qualifications relate to the subject matter of his

proposed testimony." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997)(excluding Biomechanical Engineer expert).

In *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp.2d 1310, 1315-16 (N.D. Okla. 2000), the plaintiff brought a products liability suit against the manufacturer of a spinal rod system for back injuries sustained from the rod. The court held that the plaintiff's medical expert was not qualified under *Daubert. Alexander*, 98 F.Supp.2d at 1314-15. The Court held that simply because the expert had a medical degree did not give him a license to testify about the cause of the plaintiff's injury. *Id.* at 1315. Because the witness lacked expertise in orthopedics, spinal surgery, and other areas related to the specialized opinions he offered, the court concluded that he was not "qualified as an expert by knowledge, skill, experience, training or education" and refused to allow him to testify as to the cause of plaintiffs injuries. *Id.* at 1315-16. *See also, Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969-70 (10th Cir. 2001) (trial court properly excluded orthopedic surgeon's opinion where surgeon admitted she was not an expert on intramedullary nailing but an expert in oncology); *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1088-89 (10th Cir. 2001)(trial court properly excluded mechanical engineer's opinion testimony where he tried to testify about human factors). The Court should exclude Gwin for the same reasons: she is not a qualified expert in the area of medicine relevant to this case.

Given the fact that the defense has identified Gwin as being a "medical/biomechanical expert", it is unclear just exactly what type of expertise she could possibly provide to the trier of fact. Due to her lack of qualification in engineering, biomechanical engineering, and the specialized area of spinal injuries, the court should look very closely at the opinions that Gwin seeks to submit in the context of what she is qualified to do, especially when these opinions are based on the inaccurate conclusions of Bonugli.

Defendants may attempt to salvage this problem by reminding the Court that Gwin is, in fact, a medical doctor and therefore can testify as to her medical opinion. However, as stated above, the mere conferral of a medical degree does not an "expert" in all areas of medicine make. Gwin is not qualified to testify about spinal injuries: She was an unlicensed test engineer/fuel systems development engineer for Ford for a few years; she was an emergency physician for a number of years; and now, in addition to her work as a biomechanical consultant and recent hire at a new Texas medical school with only provisional accreditation, she volunteers as a primary care physician in a small Wyoming healthcare clinic. Lisa Gwin possesses no expert qualifications in either of the fields in which she proposes to testify.

## B. GWIN'S OPINIONS ARE SPECULATIVE AND UNRELIABLE.

Procedurally, *Daubert* requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The witness' assurance that he has employed generally accepted methodology in reaching his conclusions is insufficient. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). An expert's opinion is considered unreliable if it is based upon mere subjective belief or unsupported speculation. *Goebel v. Denver & Rio Grande Western R.R. Co.*, 346 F.3d 987,992 (10th Cir.2003) (quoting *Daubert*). Educated guesses will not satisfy FRE 702. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir.1999). "[A]n expert's conclusions are not immune from scrutiny … [and the] 'court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Dodge v. Cotter*, 328 F.3d 1212,1222 (10th Cir. 2003) *(*quoting *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146, 146 L.Ed.2d 508, 118 S.Ct. 512 (1997).

Assuming, *arguendo*, that Gwin is qualified to testify as to her opinions: the facts, data, principles and methods used to form the basis of her opinions are speculative, unreliable, and lack the adequate factual basis that is required to form a scientifically valid opinion. **Gwin's opinion is based on the premise that a certain speed at impact (or "delta-v") will not result in injuries to a vehicle occupant's spine. As set forth below, this is factually incorrect and misleading.** The very foundation of Gwin's "scientific" conclusion is faulty and based upon guesswork and unsupported speculation. Because Gwin's analysis is not grounded in reliable and accurate facts, or sound scientific methodology, her opinion testimony ought to be excluded.

**1). Gwin's "engineering" and/or "biomechanic" opinions:**

Dr. Gwin indicated she predicated her biomechanic analysis on the impact analysis of Mr. Bonugli, discussed in detail below. [Exhibit 2, at 6]. "Since [Bonugli's] analysis is fundamentally flawed, any opinions based on it would be similarly flawed." [Affidavit of John J. Smith, P.E., attached hereto as Exhibit 4, at 5]. Additionally, in order to bolster her opinions, Gwin performed what she calls an "exemplar surrogate demonstration" and which she claims was based on a "closely matched exemplar vehicle and human surrogates matched to Mr. and Mrs. Stiebens for standing stature and weight." After giving what appear to be engineering and/or biomechanic opinions that Gwin is not competent to render and are not based on a reasonable degree of engineering or scientific certainty, she then opines that the "subject impact was minor, and would not be expected to cause any injury" to either Plaintiff.  [Exhibit 2, at 16].   This opinion is biomechanical in nature.

Biomechanics generally refers to the study of the action of external and internal forces on the living body. *Tuato v. Brown*,  85 Fed. Appx. 674, (10th Cir.  2003); *Dreyer v. Ryder Automotive  Carrier  Group,  Inc.*,  367  F.  Supp.  2d  413,  426  n.16  (W.D.N.Y.

2005) (acknowledging expert's definition of "biomechanics" as the "study of the interface between humans and machines and includes ergonomics."). As one court aptly explained:

> At trial, biomechanics was defined as "a marriage between medicine and engineering" in that injury is a purely mechanical process up to the instant that it occurs. Once an injury occurs, then it is purely medical. The understanding of how forces act on the human body in order to create injury is mechanical as the injury is the result of a greater force being applied to the body than it was designed to withstand.

*Guentzel v. Toyota Motor Corp.,* 768 S.W.2d 890, 895 (Tex. Ct. App. 1989),writ denied (Sept. 13, 1989) (abrogated on other grounds by *E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex. 1995).

Gwin seeks to render a biomechanical opinion despite the fact that she is not a biomechanical engineer *and* despite the lack of critical key data necessary to a competent and reliable analysis. In fact, Gwin arrives at her conclusion without ever going to the scene of the wreck, taking any measurements whatsoever, examining the vehicles, measuring the seat back position or incline, measuring the position of the headrest or the occupant spaces, without inspecting the interior for anything to indicate places where the Stiebens' bodies may impacted parts of the interior, and without taking the occupants' resilience, constitution or predisposition to injury into consideration. Consequently, Gwin's exemplar surrogate demonstration, as well as the resultant biomechanical opinion, is fundamentally flawed, as detailed in the Affidavit of John J. Smith, P.E. [Exhibit 4]:

1. <u>Gwin used surrogates that cannot be shown to replicate the actual position of the parties in the collision</u>. [Exhibit 4, at 5].

2. <u>In direct contradiction to the laws of physics, Dr. Gwin compared a traumatic event to grossly dissimilar daily activities</u>. This error has been explained to her firm dozens of times…Such a comparison is not supported by the basic principles of math and science. [*Id.*, at 5]. If Dr. Gwin wanted to demonstrate the subject collision was equivalent to a daily activity, it would be necessary to show that for both cases all

accelerations are the same, in the location applied, duration, sequence and initial position of the person. This assumes that the test subjects are identical to the crash victims in terms of age, gender, height, weight, resilience, constitution, and predisposition to injury.

Since Dr. Gwin lacked the ability to determine any of the forces on the occupants, it is impossible for her to demonstrate that the events are the same. [*Id*., at 6].

Additionally, even the peak acceleration on the occupants cannot be determined…. peak acceleration represents only one of the hundreds of forces the occupant was subjected to... However, the use of peak acceleration values is not based on any accepted engineering or scientific principle. If Dr. Gwin understood the relevant full scale testing she would be aware that the peak acceleration applies to only one of the myriad of forces the occupants were subjected to. Data from Dr. Gwin's own firm reveal[s] how the peak acceleration is only a minor factor in the event. [*Id*., at 6-7].

3.      Dr. Gwin cites to an inappropriate study to imply the risk of injury was low. Dr. Gwin has not referenced the data appropriately to take into account initial complaints versus actual diagnosis. Using her approach, the reader is led to believe it is impossible for the occupants to have been injured. Since this is factually incorrect, it is clear the data is being misapplied. [*Id*., at 8].

4.      Dr. Gwin cited to staged, safety optimized, motion studies using volunteers. This is invalid. The discussion of crash tests is specious. The occupant's injuries cannot be equated to injuries sustained by crash test volunteers for numerous reasons. In crash tests, safety is optimized. Often the volunteer is a healthy young male. Sometimes special seat belts are used. Bite blocks are employed to prevent injury to the teeth and jaw. The test subject is aware that the crash is about to take place. The test subject is positioned to receive the forces of the crash. The subject is looking straight ahead and sitting upright. In the few cases where a crash subject had their head turned, the injuries suffered were significantly worse. The sample size in crash tests is quite small. These tests are fairly expensive, therefore the number of vehicles employed and the number of test subjects used are limited.

Dr. Gwin did not mention that none of the tests matched the subject collision. These full-scale tests also reveal that Mr. Bonugli's methodology must be wrong since the energy values in collisions with no damage greatly exceed the value he determined with damage.

Dr. Gwin cited to her own firm and Szabo for the volunteer tests. If she were to review the full scale video testing from her firm or Szabo, it would be obvious the comparison to daily activities is invalid. [*Id*., at 8-9].

5.    <u>Dr. Gwin's discussion of traumatic brain injury is similarly flawed</u>. Brain injuries are associated with five mechanisms in rear impacts. The first is direct contact with the headrest, the steering wheel or other portions of the interior of the vehicle. (The occupant may not remember this contact.) The second mechanism involves centripetal forces applied during the extension/flexion process. The third involves shearing forces applied during the translation of the skull. The fourth identified mechanism deals with biochemical changes. The final mechanism is associated with vascular effects.[i,ii,iii,iv,v,vi,vii,viii,ix,x,xi,xii,xiii,xiv]

For her concussion risk Dr. Gwin relies on data from her firm and an associated organization. [*Id.*, at 9].

6.    <u>Dr. Gwin lacked the ability to determine a single force, load or moment on the occupants but still implied they were not injured</u>. Her reliance on injury assessment reference values (IARV) has not been validated for actual collisions. <u>The test data she cites is not appropriate for a motor vehicle collision</u>. [*Id.*]

7.    <u>Dr. Gwin appears to have misapplied her references</u>. As only one example, her reference to Adams is grossly misleading. The references to the work by Michael Adams regarding disc herniation demonstrate that Dr. Gwin has not applied the principles of trauma biomechanics…. <u>If Dr. Gwin has a rudimentary understanding of trauma biomechanics she is well aware that the [Adams] study does not even remotely replicate the subject collision</u>. [*Id.*, at 9-10].

8.    <u>Dr. Gwin ignored the fact that it has never been established that there is a minimum speed change value below which people are not injured in real collisions</u>. This applies to all types of collisions including frontal impacts, rear impacts, side impacts and rollovers. [*Id.*, at 10].

9.    <u>Dr. Gwin ignored the fact that the test data cited by Mr. Bonugli establishes that there were force, loads and moments applied at the location of the diagnose injuries</u>. [*Id.*].

Dr. Gwin speculates, theorizes, makes assumptions, and fills in the missing pieces in order to support her desired conclusion, while in actuality her opinion is based on the results of her own flawed and dissimilar "exemplar surrogate demonstration" and serious analytical errors. It is clear

that Gwin's biomechanical opinions and all of her opinions that are biomechanical in nature should be excluded.

### 2).  Gwin's medical opinions:

Gwin <u>did not</u> review any of Mary Stiebens' radiological imaging but states that she has taken her films into consideration in her causal analysis. [Exhibit 2, at 16]. Gwin actually did review some imaging for Chris Stiebens. Gwin concurs, based on a review of select films with radiologist Dr. Cynthia Day, that both Chris and Mary Stiebens suffered prior degenerative disc disease and no acute, traumatic injury from the wreck at issue, concluding that neither were injured in the collision at all. [*Id.*, at 16]. Yet, Gwin is not a radiologist.  She has no expertise in reading and interpreting imaging studies.  Her opinion provides no reference to an accepted methodology that establishes the ability to diagnose defects seen on imaging studies. Gwin examined select, admittedly poor-quality, radiological images of Chris Stiebens and determines that neither Plaintiff suffered acute, traumatic injury in the 2014 collision at all and, in fact, "the event was not reasonably capable of producing the effect of degenerative changes in Mr. ***and Mrs.*** Stiebens' spinal discs, as these were the result of repetitive stress over a period of years."(emphasis added). [*Id.*]. Gwin then concludes that degenerative disc disease must account for Chris' complaints of back and neck pain, and Mary's neck problems, following the accident, asserting "***Mr. and Mrs. Stiebens' imaging studies*** demonstrated degenerative changes in their spines. Those changes are the result of repetitive stress over a period of years ,and are not the result of any one time event."(emphasis added). [*Id.*].  She does so without any expertise in radiology, orthopedics, or neurosurgery, without examining Chris or Mary Stiebens, and without considering occupant resilience, constitution or predisposition to injury, or complete medical histories. Gwin's proposed testimony and conclusions as to medical causation are unreliable, incomplete, flawed, and

misleading and do not meet the *Daubert* standard for admissibility. Since Gwin is not a doctor that specializes in spinal injuries, neurology, or even radiology, any opinion she puts forth about such issues should be excluded.

Gwin further opines, now relying on Bonugli's flawed speed and force calculations of Johnson's vehicle as it collided with Plaintiffs' car, that the Stiebens would not have injured their spines in this accident. [*Id*.]. Gwin points to Day's assessment of the select radiological films and her interpretation that Chris Stiebens suffered no acute, traumatic injuries in this wreck, as confirmation of her causation analysis. Gwin decides, based on a perfect storm of flawed analyses, that her vehicle dynamics and occupant kinematics studies reveals the Stiebens' "net spinal motion was within physiologic limits," and stating "there was no mechanism for them to be injured in an event with similar accelerations," implying there could be no injury from this incident.  Dr. Gwin embraces the position that, because she believes that the injury was highly unlikely at the force Mr. Bonugli calculated, it did not occur. Dr. Gwin cannot rewrite reality by simply stating that a rare occurrence is an impossible one. Yet, essentially Gwin's medical conclusion is a result of the combination of the results of her own flawed exemplar demonstration, Bonugli's flawed impact analysis, and Day's "limited use" assessment of select radiological imaging. For the reasons set forth above, Gwin is not qualified by training or experience to render such an opinion and, further, the opinion is both speculative and unreliable.  This further illuminates the fact that any opinion Gwin puts forth about such issues should be excluded.

### C.  GWIN'S OPINION REGARDING MEDICAL IMAGING IS CUMULATIVE.

Gwin's opinion regarding the medical imaging is also cumulative.  As stated above, Gwin is not a radiologist.  Therefore, her opinion from reviewing select imaging records is nothing more than a regurgitation of information that is really properly presented by a radiologist.  The defense

has hired a board-certified radiologist and an I.M.E. who will opine about the meaning of these studies. Therefore, Gwin's opinion regarding the same provides nothing more than what the radiologist and/or I.M.E. will provide and should be excluded as being cumulative.

## II.   CYNTHIA DAY:

### A.  DR. DAY'S OPINION REGARDING MEDICAL IMAGING IS CUMULATIVE.

Day's opinion testimony regarding her interpretation of Chris Stiebens' radiological imaging is also cumulative.  The defense has hired an I.M.E., Dr. Stephen Conner, who will opine about the meaning of these studies. Therefore, Day's opinion regarding the same provides nothing more than what Dr. Conner will provide and should be excluded as being cumulative.

### B.  DAY IS NOT QUALIFIED TO RENDER THE OPINIONS SOUGHT BY THE DEFENSE.

Like Gwin, Cynthia Day is an employee of BRC and their only expert in the field of radiology. Day was hired by the defense to review and re-interpret Chris Stiebens' radiological studies alone -- in a vacuum and without any other medical records or history --  and find he suffered no acute, traumatic injury from the subject incident. While her qualifications as a board-certified radiologist appear at first glance to qualify her as an expert to re-intepret or second-guess Chris Stieben's radiological studies, Dr. Day is not certified as a neuroradiologist and, as discussed above, specialization and practice in one area of medicine does not automatically cloak the practitioner with expertise in other or all areas of medicine. [Day c.v. & ABMS certification, attached hereto as Exhibit 5].  According to the American Board of Radiology, of which Dr. Day is a member, physicians practicing in the field of radiology specialize in Diagnostic Radiology, Interventional Radiology, or Radiation Oncology. They may also certify, with additional education and practical training,  in a number of subspecialties, including Neuroradiology. *See,* ABMS at

https://www.abms.org/member-boards/contact-an-abms-member-board/american-board-of-radiology/. Dr. Day has not completed the additional two years of training required to hold certification in the field of neuroradiology, which is the precise area of expertise necessary to fully evaluate this case.

Neuroradiology involves the diagnosis and treatment of disorders of the brain, spine, sinuses, spinal cord, neck and central nervous system. Imaging commonly used includes myelography, interventional techniques, and magnetic resonance imaging (MRI). *See,* ABMS at https://www.abms.org/member-boards/contact-an-abms-member-board/american-board-of-radiology/. Advanced neuroradiological studies enable the reader to see more detailed information regarding bones, organs and soft tissue, as compared to the relatively quick X-ray capture of a single image, however, aside from a few initial chiropractor X-rays and a set of X-rays taken by a radiologist in the emergency room after the accident, Chris Stiebens' imaging films are predominately neuroradiological images, requiring competent interpretation and diagnosis by a certified neuroradiologist.

Defendants' counsel may try to counter this position by pointing to the fact that Dr. Day completed a 2016 three-day course in neuroradiology and holds a Certificate (of Completion) in Neuroradiology. [Exhibit 5, at 1]. In fact, the requirements for the completion certificate were merely to attend the course and interpret a minimum of 100 cases, a far cry from the two-year requirement necessary to hold oneself out as a specialist in neuroradiology. [2016 course brochure, attached hereto as Exhibit 6].

A court should exclude the testimony of any expert witness who is not qualified to testify in a particular field. Cynthia Day, while no doubt a highly-trained radiologist, is not a

neuroradiologist and her opinions regarding Chris Stiebens' neuroradiological studies should be excluded.

### C.  DAY'S OPINIONS ARE SPECULATIVE AND UNRELIABLE.

Notwithstanding her lack of qualification in the specialty of neuroradiology, Day's opinions are not reliable for several reasons. Day's Imaging Report, in reference to the X-ray images she reviewed, and upon which Lisa Gwin hangs her hat,  states that the "[i]mages are digitized copies of hanging films, therefore *evaluation is somewhat limited*" and, in another instance, that the "frontal view is underexposed, also *limiting evaluation*." (emphasis added). Yet Day presses forward and uses these images as the foundation for her analysis. [Day Report, attached hereto as Exhibit 7, at 1-3]. Additionally, Day did not examine Christopher Stiebens and was not provided with copies of his medical records or medical history in order to completely and accurately interpret the imaging studies. Obviously, a diagnostic radiologist is simply not in the same, hands-on position as a neurosurgeon in treating patients, significantly increasing the risk of misinterpretation or interpretation made in a vacuum of information. Finally, Day reviewed several additional MRI reports conducted for Chris Stiebens' neurosurgeon, yet neglected to mention these in her Report. They are listed in the documents she was provided by Defendants' counsel, yet, curiously, they are never mentioned again.

Differential diagnosis, or differential etiology, is a standard scientific technique.  However, to be reliable, it is performed after a physical examination, the taking of medical histories, and the review of clinical tests and laboratory tests which Day did not do in this case.  It is generally accomplished by determining all possible causes for a patient's symptoms and then eliminating potential causes until discovering what cannot be ruled out or which is deemed most likely. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999).  An unreliable differential

diagnosis does not pass *Daubert* scrutiny. *Id.* at 265-66.  For example, in determining whether an expert orthopedic surgeon's testimony was admissible, the United States District Court for the District of Utah noted, under the heightened requirements of *Daubert*, "[n]o expert orthopedic surgeon would attempt to make a diagnosis without examining the patient, without considering the entirety of a patient's records, by allowing a non-doctor to select records before she considered them, or by allowing non-medical personnel to conduct patient interviews used for diagnostic purposes." *McCollin v. Synthes Inc.*, 50 F. Supp. 2d 1119, 1127 (D. Utah). The Court held that the expert orthopedist's testimony was unreliable and would not be permitted at trial under the standard set forth in *Daubert* and *Kumho*. *Id.*

Testimony regarding the review and interpretation of radiological imaging, so critical in this case, should be held to no less stringent a standard. Dr. Day formed her opinion in a vacuum of information, with nothing other than a few poor X-rays and select MRI images, and, not surprisingly, finds multilevel degenerative changes in the spine of this formerly active, 45-year-old man, but no evidence of acute, traumatic injury as a result of this car wreck. [Exhibit 7, at 4]. The testimony is unreliable and speculative and should be excluded.

### D.  ENRIQUE BONUGLI:

#### A.  BONUGLI IS NOT QUALIFIED TO RENDER THE OPINIONS SOUGHT BY THE DEFENSE.

Enrique Bonugli, an employee and former student intern at BRC, has been designated as an accident reconstructionist/biomechanics expert for the defense. Bonugli began his engineering career as an intern at BRC in 2002, returning and advancing to the position of "test engineer" upon completion of a Bachelor of Science in <u>Industrial Engineering</u> in 2003. By the time he enrolled in a master's program at the University of Texas- San Antonio,  Bonugli had advanced to the lofty

position of "senior test engineer" at BRC. Unlike most of BRC consultants held out as biomechanical experts, Bonguli actually earned a Master's of Science in <u>Biomechanical Engineering</u> in 2015, as well as promotion to the position of Technical Director. [Bonugli c.v., attached hereto as Exhibit 8, at 1-3]. However, although his educational background suggests an expertise in biomechanics, Mr. Bonugli is not a Professional Engineer and does not hold the professional license necessary to proffer an expert engineering opinion. Accordingly, Bonugli is not qualified to testify in this matter as an expert in any branch of the profession of engineering, including biomechanics/biomechanical engineering.  Thus, any opinion rooted in any aspect of engineering should be excluded.

It appears that BRC has learned, likely from the court's frequent exclusion of their "expert" testimony, to drop the term "engineer" and/or "engineering" from their job titles and expert reports. Refraining from certifying his accident reconstruction/biomechanical report to a reasonable degree of "engineering" certainty, as Bonugli does here, doesn't change the fact that his opinions and testimony remain rooted in the discipline of engineering and must be excluded. Bonugli is invading the province of the jury by substituting his subjective, biased interpretation of the evidence for that of the jury and practicing junk science to improperly influence the outcome of this litigation.

## B.  BONUGLI'S OPINIONS ARE SPECULATIVE AND UNRELIABLE.

Bonugli's proposed testimony does not meet the threshold for admission pursuant to current law, as his opinions and conclusions are speculative, based on facts not in evidence, and on data summarily provided by Defendant and accepted without question by Bonugli in rendering his opinions. Curiously, although he is unqualified to testify as to causation, Bonugli was provided copies of the Stiebens' medical records, but generally appears to have based his "reconstruction" and impact analysis on the official Oklahoma Traffic Collision Report, 2-D post-incident

photographs of and repair estimates for two of the three vehicles involved, and a self-developed or BRC developed "damage-based crash simulation." [Exhibit 8, at 6].

The basic requirements for ACTAR accreditation include sitting for a two-part exam after providing proof of completion of several approved accident reconstruction courses. The test is comprised of 75 "theory" questions on topics such as scene examination, scene measurements, tire mark evaluation, tire evidence and vehicle evidence. The second part of the examination is a practicum involving completion of an accident reconstruction analysis based on data provided by ACTAR. *See,* ACTAR website at https://actar.org/accreditation/exam. At the time of his accreditation in 2009, Bonugli had completed a total of three reconstruction courses, although he completed several more reconstruction-related courses in the following years. Yet, despite his education in the area of accident reconstruction, Bonugli based this particular reconstruction analysis on 2-D photos, speculation, and faulty assumptions to fill in critical missing data. In short, one of the many problems with Bonugli's opinion testimony is that it fails to provide a "reliable" methodology as guidance for the Court. Bonugli did not investigate this accident. Bonugli did not go to the site of the collision. Bonugi did not take any photographs or measurements whatsoever. Bonugli did not shoot coordinates, determine the line of site, or the coefficient of friction. Bonugli did not meet or even speak with the Trooper. All of this is normal and acceptable methodology for accident reconstruction and Bonugli ignored it all. Worse, he filled in the huge gaps produced by the lack of data he was provided by Defendants' counsel with faulty assumptions and speculation. He failed to consider Defendants' Volvo tractor-trailer at all, other than to mention that the damage to the fully loaded tractor-trailer was not visible in the single photo he was provided: he simply "back-tracked" his mathematical calculations until he came up with a closing velocity to match his

intended delta-v calculation. [Bonugli Report, attached hereto as Exhibit 9, at 7]. Further, as attested in the Affidavit of John J. Smith, P.E.,

1.  There appears to be far too much damage to account for the low speeds reported by Mr. Bonugli. [Exhibit 4, at 5].

2.  Mr. Bonugli did not use a valid methodology to determine the speeds involved in the collision, making at least two fundamental errors. [*Id*., at 2].

*Daubert* demands that if a defense expert performs a test, it must be done properly and generate reliable opinions. BRC's testing fails on this point.

a)  He did not use a valid method to determine the energy associated with the damage to the vehicles. In using momentum, energy, restitution model as he reported, if the energy is not correct, the methodology will fail…. The methodology Mr. Bonugli used does not return valid results. Mr. Bonugli noted he used NHTSA test 2968. However, there were at least 5 other NHTSA test he could have used. Had Mr. Bonugli used all of the available test, he would have realized his approach was scientifically unsound… If extremely small variations in impact conditions can cause drastically different results, the methodology is not valid… For this reason, Mr. Bonugli's speed determinations cannot be relied upon.

Mr. Bonugli attempted to validate his results using a methodology invented by his firm that is not valid. Based on their unique methodology, Mr. Bonugli reported the impact speed of the Saturn into the Honda was approximately 3 to 5 m.p.h. The two mythologies returned results with variations of 22% to over 100%. [*Id*.].

b)  Mr. Bonugli also turned the collision into an underride which is was not. The estimates for both vehicles include damage to the bumper systems. Mr. Bonugli's approach appears to ignore the additional damage reported. [*Id*.].

3.  Mr. Bonugli reported a single value for the acceleration on the Honda of less than 2.4 Gs based on assumptions. However, even if correct it would be irrelevant since the acceleration on the vehicle does not represent what is happening to the occupant…. Clearly, attempting to describe an event that occurs in four dimension with one partial value for an event is not valid. This approach was invented by the defense for litigation and is not based on any accepted science or engineering. [*Id*.].

4.     In the course of reviewing numerous reports from BRC over the last years a pattern has emerged that regardless of the damage to the vehicles in an impact, the change in velocity is routinely in the vicinity of 5 m.p.h. for the struck vehicle. [*Id*., at 4].

The reason for this approach in minimizing speeds is found in defense litigation. In the 1990s a series of full scale kinematic tests were run by companies routinely hired by defense firms. These kinematic studies were safety optimized to prevent any of the defense experts from being hurt. The defense experts then proclaimed that since they were not hurt, no one should be hurt in a rear impact collision with a change in velocity under 5 m.p.h.[1] Since these experts earn their living testifying that people are not injured, the bias introduced by testing themselves is obvious and inappropriate.

Eventually, some safety optimized tests were run using prescreened volunteers. While these studies were still safety optimized to protect the subjects, some researcher bias was removed. These tests resulted in symptoms being reported at the lowest level tested, a change in velocity of 2.5 m.p.h.[2] These tests also revealed information about the vehicles. None of the relevant tests resulted in damage comparable to the damage seen in the subject collision.

The problem with using these studies to determine if a given person was injured was readily apparent to the biomechanical community. Other research was performed using data from the motoring public which had been involved in actual collisions. This research in numerous locations established that there is no identified threshold for injury[3]. [*Id*., at 4-5].

The cumulative effect of the above-described fundamental errors and speculative, unreliable methodology, clearly illuminates the fact that Bonugli should not be allowed to testify on the subject of accident reconstruction/biomechanics at trial.

## CONCLUSION

**WHEREFORE**, based upon Federal Rule 702, *Daubert* and *Kumho*, and the above-referenced citations, the Court is asked to determine that Defendants' designated expert, Dr. Lisa Gwin, is not a medical/biomechanical expert who is qualified to give testimony at the trial of this matter and that her testimony does not comply with the necessary foundational requirements of

Rule 702 and the tests established by the United States Supreme Court and the 10th Circuit Court for its presentation at the time of trial;

**FURTHER**, based upon Federal Rule 702, *Daubert* and *Kumho*, and the above- referenced citations, the Court is asked to determine that Defendants' designated expert, Dr. Cynthia Day, is not a radiology expert who is qualified to give testimony at the trial of this matter and that her testimony does not comply with the necessary foundational requirements of Rule 702 and the tests established by the United States Supreme Court and the 10th Circuit Court for its presentation at the time of trial; and

**FURTHER**, based upon Federal Rule 702, *Daubert* and *Kumho*, and the above- referenced citations, the Court is asked to determine that Defendants' designated expert, Enrique Bonugli, is not an accident reconstruction/biomechanical expert who is qualified to give testimony at the trial of this matter and that his testimony does not comply with the necessary foundational requirements of Rule 702 and the tests established by the United States Supreme Court and the 10th Circuit Court for its presentation at the time of trial.

Respectfully submitted,

**THE NIX LAW FIRM**

*/s/ David M. Nix*
David M. Nix, OBA# 14894
1401 Holliday, Suite 400
Wichita Falls, TX 76301
Ph: 940-322-8200
Fax: 940-228-3233
dnix@thenixlawfirm.com
*Attorney for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of August, 2018, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Lane R. Neal
Durbin, Larimore & Bialick
920 N. Harvey
Oklahoma City, OK 73102-2610
TEL: 405-235-9584
FAX: 405-235-0551
Email: dlb@dbl.net
*Attorneys for Defendants*

/s/ *David M. Nix*
David M. Nix