UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

1. CHRISTOPHER L. STIEBENS and
2. MARY E. STIEBENS,

     Plaintiffs,

vs.

1. RESILITE SPORTS PRODUCTS, INC.
2. and LEON M. STAUFFER,

     Defendants.

Case No. 5:16-cv-00629-F

---

**DEFENDANTS' OBJECTION TO PLAINTIFFS' *DAUBERT* MOTION**

---

Gerald E. Durbin, II, OBA #2553
David B. Donchin, OBA #10783
Lane R. Neal, OBA #22246
Durbin, Larimore & Bialick
920 North Harvey
Oklahoma City, OK 73102-2610
Telephone: (405) 235-9584
Facsimile: (405) 235-0551
dlb@dlb.net
Attorneys for Defendants

August 22, 2018

# TABLE OF CONTENTS

Page

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## PROPOSITION I

DEFENDANTS' EXPERTS ARE QUALIFIED. . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    Dr. Lisa Gwin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.    Dr. Cynthia Day. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.    Enrique Bonugli. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## PROPOSITION II

DEFENDANTS' EXPERTS' OPINIONS ARE RELIABLE. . . . . . . . . . . . . . . . 17

A.    Dr. Lisa Gwin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.    Dr. Cynthia Day. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.    Enrique Bonugli. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# <u>TABLE OF AUTHORITIES</u>

Page

<u>Cases</u>

<u>103 Investors I, L.P. v. Square D Co.</u>, 470 F.3d 985 (10th Cir. 2006). . . . . . . . . . 3

<u>Alexander v. Smith & Nephew, P.L.C.</u>, 98 F.Supp.2d 1310 (N.D. Okla. 2000).. 14

<u>Alfred v. Caterpillar, Inc.</u>, 262 F.3d 1083 (10th Cir. 2001).. . . . . . . . . . . . . . . . 13

<u>Berry v. City of Detroit</u>, 25 F.3d 1342 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . 4

<u>Biloxi Yacht Club, Inc. v. Grand Casinos of Mississippi, Inc.-Biloxi</u>,
2009 WL 10676951 (S.D. Miss. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Bitler v. A.O. Smith Corp.</u>, 400 F.3d 1227 (10th Cir. 2005).. . . . . . . . . . . . . . . . 3

<u>Daubert v. Merrell Dow Pharms., Inc.</u>,
509 U.S. 579 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10, 16, 17, 19-21

<u>Dillon Companies, Inc. v. Hussmann Corp.</u>,
163 Fed.Appx. 749 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

<u>Emig v. Electrolux Home Products Inc.</u>,
2008 WL 4200988, *5 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Goebel v. Denver & Rio Grande W. Ry.</u>, 346 F.3d 987 (10th Cir. 2003).. . . . . . . 3

<u>Graves v. Mazda Motor Corp.</u>, 675 F.Supp. 2d 1082 (W.D. Okla. 2009).. . . . . . 4

<u>Hall v. Conoco, Inc.</u>, 886 F.3d 1308 (10th Cir. 2018).. . . . . . . . . . . . . . . . . . . . . 2

<u>Hilaire v. DeWalt Indus. Tool Co.</u>, 54 F.Supp.3d 223(E.D.N.Y. 2014). . . . 5, 7, 11

<u>Humphrey v. Diamant Board, Inc.</u>, 556 F.Supp.2d 167 (E.D.N.Y. 2008).. . . . . . 12

<u>Jones v. Otis Elevator Co.</u>, 861 F.2d 655 (11th Cir. 1988). . . . . . . . . . . . . . . . . 17

<u>Joudeh v. MS Carriers, Inc.</u>, 2011 WL 13228496, *3 (N.D. Tex. 2011).. . . . . . . 9

Kannakeril v. Terminix Int'l Inc., 128 F.3d 802 (3d Cir. 1997).. . . . . . . . . . . . .  21

Keiffer v. Weston Land, Inc., 90 F.3d 1496 (10th Cir. 1996). . . . . . . . . . . . . . .  17

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).  . . . . . . . . . . .  3, 17, 19

Lara v. Delta International Machinery Corp.,
174 F.Supp.3d 719 (E.D.N.Y. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Lippe v. Howard, 287 F.Supp.3d 1271 (W.D. Okla. 2018). . . . . . . . . . . . . . . . . . 3-5

Lobell v. Grand Casinos of Mississippi, Inc.–Biloxi,
2010 WL 4553563 (S.D. Miss. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

McCoy v. Whirlpool Corp. (unpub.),
2003 WIL 1923016 at *6 (D. Kan. Apr. 21, 2003). . . . . . . . . . . . . . . . . . . . . . . . .  21

O'Conner v. Commonwealth Edison Co., 807 F.Supp. 1376 (C.D. Ill. 1992). . . .  13

Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965 (10th Cir. 2001).. .  3, 14

Riley v. Ford Motor Company, 2011 WL 13079483 (S.D. Miss. 2011). . . . . . . .  10

Robinson v. Mo. Pac. R.R. Co., 16 F.3d 1083 (10 th Cir. 1994).. . . . . . . . . . . .  17

Smelser v. Norfolk S. Ry. Co., 105 F.3d 299 (6th Cir. 1997). . . . . . . . . . . . . . .  13

Sprint Communications Co., L.P. v. Vonage Holdings Corp.,
500 F.Supp.2d 1290 (D. Kan. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Werth v. Makita Elec. Works, Ltd., 950 F.2d 643 (10th Cir. 1991). . . . . . . . . . .  21

**Statutes**

59 O.S. § 10-475.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Rule 702 of the Federal Rules of Evidence. . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 9, 16

COME NOW the Defendants, Resilite Sports Products, Inc. and Leon M. Stauffer ("Defendants"), and object to Plaintiffs' Motion to Exclude Testimony of Dr. Lisa Gwin, Enrique Bonugli and Dr. Cynthia Day [Doc. 39]. Plaintiffs' Motion fails to establish that these experts are unqualified or that their opinions are unreliable. The opinions of Dr. Gwin, Dr. Day and Bonulgi are all based upon scientific methodologies and sufficient facts. As such, the Court should deny Plaintiffs' Motion. Defendants submit the following supporting brief.

## INTRODUCTION

This case arises out of an automobile accident on June 19, 2014. Leon Stauffer was driving a Volvo tractor-trailer for Resilite Sports Products, traveling eastbound on I-44 near mile marker 174 in Lincoln County, Oklahoma, where traffic slowed for a construction zone causing a closure in the right lane. Stauffer's tractor-trailer was in the inside lane and slowing down for traffic conditions. A sedan driven by Chad Johnson pulled in front of Stauffer's tractor-trailer and abruptly applied the brakes. A Honda CRV driven by Plaintiff Mary Stiebens with Plaintiff Christopher Stiebens in the front passenger seat was directly in front of Johnson's sedan and moved into the inside lane, as well. Stauffer attempted to slow his tractor-trailer but was unable to stop and collided with the rear-bumper of Johnson's Saturn, which was pushed forward, causing an underriding impact with Plaintiffs' Honda CRV.

Oklahoma Highway Patrolman Charles Criddle and a Chandler EMS ambulance responded to the scene. Mrs. Stiebens denied any injury to Trooper Criddle. Mr. Stiebens refused treatment from Chandler EMS. Plaintiffs left the accident scene in their Honda CRV and continued on to Tulsa. The next day, they drove from Tulsa to Lawton, their hometown, without stopping at any hospital or urgent care clinic in Tulsa, Oklahoma City or Lawton.

Upon returning to Lawton, Plaintiffs went to see a chiropractor. They returned to the chiropractor for another visit on June 23, 2014. On June 26, 2014, Plaintiffs presented to the Comanche County Emergency Room with soft-tissue complaints. Plaintiffs now claim medical treatment from the initial chiropractor visit and the following three years, with costs in the hundreds of thousands of dollars. Yet, Plaintiffs' conduct and complaints (or lack thereof) immediately following the accident, as well as the very minor damage to their vehicle, wholly contradict a finding that their three years of hundreds of thousands of dollars of medical treatment was caused by the low speed accident at issue in this case. Accordingly, Defendants engaged Dr. Gwin, Dr. Day, and Bonugli of Biodynamic Research Corporation ("BRC") to assist in the investigation into the causation of Plaintiffs' alleged injuries. These experts have written reports and will testify at trial that the subject accident did not cause Plaintiffs' claimed injuries.

As a preliminary matter, Plaintiffs begin their Motion by citing a chart they created that summarizes cases where courts have excluded or limited BRC experts under Daubert. This "summary" does not identify the experts excluded, it does not provide case numbers, it does not provide case facts and it does not give any details as to the basis for exclusion or limitation. Additionally, Plaintiffs inaccurately claim that these BRC experts were excluded based upon "their blatant and obvious bias." *See* Plaintiffs' Motion, p. 2. As this Court is no doubt well-aware, "blatant and obvious bias" is not a factor or consideration for exclusion of expert testimony under Rule 702, Daubert or Kumho. The proper forum for such an argument is during cross-examination of an expert witness at trial, not in a Daubert Motion.

## ARGUMENTS AND AUTHORITIES

## STANDARD OF REVIEW

Federal District Courts have "wide latitude" to determine whether or not to exclude an expert witness's opinion testimony. Hall v. Conoco, Inc., 886 F.3d 1308, 1311 (10th Cir.

2018); Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1232 (10th Cir. 2005); Goebel v. Denver & Rio Grande W. Ry., 346 F.3d 987, 990 (10th Cir. 2003). The Federal Appellate Courts review such a determination, which constitutes an exercise of the District Court's gatekeeping function, for an abuse of discretion. Id. The Appellate Court will not disturb the District Court's ruling absent a showing of a clear error of judgment. Id.

Rule 702 of the Federal Rules of Evidence provides the standard and requirements for admission of expert opinion testimony, as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A Daubert challenge in the 10th Circuit requires a two-step analysis. The first step is to determine "whether the expert is qualified by knowledge, skill, experience, training or education to render the opinion." Lippe v. Howard, 287 F.Supp.3d 1271, 1277 (W.D. Okla. 2018). If the expert is qualified, "the Court must then determine whether the expert's opinion is reliable under the principles set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999) and relevant, in that it will assist the trier of fact." Id.; see also 103 Investors I, L.P. v. Square D Co., 470 F.3d 985, 990 (10th Cir. 2006); Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001).

As set forth below, Dr. Gwin, Dr. Day and Bonugli are each highly qualified in their respective areas by the totality of their knowledge, skill, experience, training and education. Likewise, their opinions are reliable under the principles set forth in Daubert and Kumho

<u>Tire</u>, and they will assist the trier of fact. As such, the expert testimony is admissible and the Court should deny Plaintiff's Motion.

<u>**PROPOSITION I**</u>

**DEFENDANTS' EXPERTS ARE QUALIFIED.**

Plaintiffs purport that Dr. Gwin, Dr. Day and Bonugli are not qualified. As to Dr. Gwin, Plaintiffs argue that she is not qualified to opine as to causation of Plaintiffs' physical injuries from the subject accident because (1) she does not hold a degree or license in mechanical or biomechanical engineering, and (2) she does not specialize in spinal injuries as a medical doctor. Plaintiffs argue that Dr. Day is not qualified to interpret Plaintiffs' imaging reports because she does not sub-specialize in *neuro*radiology. Lastly, Plaintiffs argue that Bonugli is not qualified to render accident reconstruction opinions because he is not a licensed professional engineer.

In determining whether these experts are qualified, the issue is "'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" <u>Graves v. Mazda Motor Corp.</u>, 675 F.Supp. 2d 1082, 1092-1093 (W.D. Okla. 2009) (quoting <u>Berry v. City of Detroit</u>, 25 F.3d 1342 1351 (6th Cir. 1994). In the <u>Lippe</u> case, this Western District Court recently reiterated that an expert witness must be qualified in two ways: (1) generally with knowledge, skill, experience, training or education, and (2) specifically in regards to the substance of the opinion offered. The Court explained as follows:

> Simply put, **"[t]he real question is, what is he an expert about?"** *In re Williams Sec. Litigation*, 496 F.Supp.2d 1195, 1232 (N.D. Okla. 2007) (quoting *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) ). Under controlling case law, including *Ralston*, the qualifications of a proposed expert must be assessed only after the specific matters he proposes to address have been identified. *Graves*, 675 F.Supp.2d at 1093; *In re Williams Sec. Litigation*, 496 F.Supp.2d at 1232. **"[T]he expert's qualifications must be both (I) adequate in a general,**

4

> **qualitative sense (i.e., 'knowledge, skill, experience, training or education'**
> **as required by Rule 702) and (ii) specific to the matters he proposes to**
> **address as an expert."** *Id*.

Lippe, at 1279. (emphasis added).

Further, "the totality of an expert's qualifications should be considered in evaluating whether or not his or her testimony is admissible." Hilaire v. DeWalt Indus. Tool Co., 54 F.Supp.3d 223, 236 (E.D.N.Y. 2014). Looking at the totality of each expert's qualifications, Dr. Gwin, Dr. Day and Bonugli are each generally qualified by their knowledge, skill experience, training and education, as well as specifically qualified in the areas involved in determining medical and injury causation in this particular automobile accident case.

### A.     Dr. Lisa Gwin

Dr. Gwin is a medical and biomechanical expert who will testify regarding her review of the evidence concerning the accident, Plaintiff's medical conditions and records, observations, opinions and conclusions concerning the injury mechanisms and injury causation at issue in the subject accident. [Doc. 31]. Dr. Gwin's opinion is that the subject accident did not cause Plaintiffs' claimed physical injuries. [Doc. 39-2]. Breaking her medical and biomechanical opinions down into smaller parts, Dr. Gwin opines the following:

> (1) the subject impact was not significant enough to be expected to cause any injury;
>
> (2) Plaintiffs' recall of the accident and presented symptoms near the time of the accident are inconsistent with traumatic brain injury;
>
> (3) Mr. Stiebens' neck, back and extremity pain, including extremity tingling, all predate the accident and therefore were not caused by the accident;
>
> (4) Mr. Stiebens' pars defects and spondylolisthesis predated the accident and therefore were not caused by the accident; and,
>
> (5) both Plaintiffs' imaging studies demonstrate degenerative changes in their spines overtime that were not caused by any one event.

[Doc. 39-2].

The Court must first determine whether Dr. Gwin is generally qualified to give medical and biomechanical opinions by her knowledge, skill, experience, training or education; then, must determine whether she is specifically qualified to opine on the issues involved in determining injury causation in this case, namely analysis of vehicle dynamics, occupant kinematics, biomechanics, determination of injury potential and medical record/imaging review and analysis.

Dr. Gwin's educational background encompasses medicine and engineering. She received a Bachelor of Science in Electrical Engineering from the Illinois Institute of Technology in 1987, wherein she studied the fundamental sciences implicit in an engineering degree, including physics, chemistry, mathematics, metallurgy, statics, dynamics and thermodynamics. [Doc. 39-2; Doc. 39-3]. *See also* Affidavit of Dr. Lisa Gwin, Exhibit 1. She received a Bachelor of Science in Nursing from Wayne State University in 1995, as well as a Doctor of Osteopathic Medicine from Arizona College of Osteopathic Medicine in 2003. Id. She completed her Residency in Emergency Medicine in 2006 at the University of Kentucky, where she cared for patients in the emergency department and completed rotations in trauma, surgical intensive care, internal medicine, obstetrics, orthopedic surgery, air medical transport and EMRS. Id.

Dr. Gwin's professional experience encompasses medicine, automotive engineering and biomechanical consulting. She is Board Certified in Emergency Medicine and has worked as a nurse and physician in emergency departments in Texas, Montana, Arizona and Wyoming for over 20 years. [Doc. 39-2; Doc. 39-3; Ex. 1]. Dr. Gwin also has extensive professional experience in automotive engineering and biomechanical engineering. Prior to going to medical school, she worked as a test engineer and fuel systems development engineer at Ford Motor Company for six years, working with cars, light trucks and heavy

trucks. Id. After joining BRC in 2012, Dr. Gwin completed a six-month in-house training program with respect to biomechanical engineering and injury causation analysis, which is the method she employed in this case. Id. To date, she has reviewed over 100 cases as a consultant, in which injuries were claimed and in which she applied biomechanical analysis and the injury causation method. Id. She is accredited with the Accreditation Commission for Traffic Accident Reconstruction. Id. Dr. Gwin clearly possesses the knowledge, skill, experience, training and education of a medical and biomechanical expert.

Dr. Gwin's expertise is specifically tailored to the precise issues involved in determining injury causation in this case, where Plaintiffs claim they suffered acute injuries to their necks and backs as a result of a low speed accident. As a board certified emergency physician, Dr. Gwin is specifically trained in triage, assessment, diagnosis and treatment of **acutely injured patients**. [Ex. 1]. Distinguishing between acute injuries and chronic conditions, as well as understanding the mechanisms of injuries, are essential aspects of optimum emergency care. Id. Dr. Gwin is specifically qualified to make assessments in the disciplines of injury potential and medical analysis, which are integral to biomechanical and injury causation analysis. Id. Likewise, Dr. Gwin is trained and experienced in automotive engineering, testing and biomechanics, which gives her the requisite knowledge to consider and evaluate the impact this accident had on Plaintiffs' bodies by using the injury causation analysis method. **Dr. Gwin's combination of training and experience in emergency departments, biomechanical consulting and automotive engineering makes her uniquely qualified for the issues in this case–analysis of vehicle dynamics, occupant kinematics, biomechanics, determination of injury potential and medical record/imaging review and analysis**. Dr. Gwin's knowledge of these relevant subjects will assist the jury. *See* Hilaire, at 235 ("In considering a witness' practical experiences and education background

7

as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.").

Plaintiffs argue that Dr. Gwin is not qualified from a biomechanical perspective because she does not have an Oklahoma professional engineering license under 59 O.S. § 10-475.1, and because she has an electrical engineering degree, not mechanical or biomechanical. An Oklahoma professional license in any field of engineering is not required for Dr. Gwin to give expert opinion testimony in this case and the state licensing statute certainly does not operate to determine admissibility of evidence in Federal District Court. The Oklahoma state statute Plaintiffs cite regarding licensing states that a person holding herself out as a Professional Engineer, and rendering a Professional Engineering Report, whether it is related to expert opinion testimony or for some other purpose, must have a license. This statute has no bearing on admissibility of expert witness testimony, particularly where, as here, the expert does not hold herself out to be a licensed Professional Engineer and her report is not a Professional Engineering Report with a licensing stamp at the end. Rather, Dr. Gwin is a medical and biomechanical expert with expertise and knowledge as to engineering concepts that are relevant and helpful to determining causation in this case.

The 10th Circuit and other Federal District Courts have consistently rejected this argument that lack of an engineering license renders an expert unqualified. In Dillon Companies, Inc. v. Hussmann Corp., 163 Fed.Appx. 749 (10th Cir. 2006), the plaintiff argued on appeal the defendant's engineering expert was not qualified because he did not have a Colorado engineering license under the state's licensing statute. The Court rejected this argument, noting the plaintiff failed to provide the Court with any authority "concluding that an expert with an engineering background was not qualified to testify because he was not licensed in the state where the trial occurred." Id. at 756.

In <u>Biloxi Yacht Club, Inc. v. Grand Casinos of Mississippi, Inc.-Biloxi</u>, 2009 WL 10676951 (S.D. Miss. 2009), the defendant moved to exclude the plaintiff's engineering expert on the basis that he was not a licensed Mississippi engineer, relying upon Mississippi's version of the Oklahoma statute cited in Plaintiff's brief here. <u>Id</u>. at *1. The statute required a Mississippi engineering license in order to practice engineering and, like the Oklahoma statute, defined the "practice of engineering" to include giving expert testimony. **The Court found that the expert was qualified under Rule 702, as the state licensing statute was not the proper standard for determining admissibility of expert testimony, and the issue of licensing went to the weight and credibility of the expert's testimony, to be determined by the jury at trial**. The Court stated the following in that regard:

> In the opinion of the Court, **the inquiry regarding the statutory requirements for the practice of engineering, or what professional conduct may be proscribed by state law is different from this Court's inquiry regarding whether a witness is qualified to testify as an expert**. Assuming that Mr. Comer's anticipated expert testimony constitutes the unlicensed "practice of engineering" as that term is defined by Mississippi Code Annotated § 73–13–3, **then that is between Mr. Comer and the Mississippi Board of Engineering**. This Court need not, and will not wade into any quiescent challenge of the breadth of Mississippi law regulating the practice of engineering. Instead, the focus here is on of the admissibility of expert testimony in federal court; which is governed by federal law. *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 292 (5th Cir. 1975) (declining to apply Mississippi law on expert qualifications). **Consequently, rule 702 of the Federal rules of Evidence is the appropriate standard for determining whether a witness is permitted provide to expert testimony at trial**. It will ultimately be up to a jury to determine whether, and to what extent, the absence of a Mississippi engineering licence affects the weight or credibility of the testimony.

<u>Id</u>; *see also* <u>Joudeh v. MS Carriers, Inc.</u>, 2011 WL 13228496, *3 (N.D. Tex. 2011) ("The inquiry regarding... what professional conduct may be proscribed by state law is different than the inquiry regarding whether a witness is qualified to testify as an expert."); <u>Lobell v. Grand Casinos of Mississippi, Inc.–Biloxi</u>, 2010 WL 4553563 (S.D. Miss. 2010) ("the issue

of whether Comer has complied with Mississippi's licensing requirements goes to the weight and credibility of his testimony, not its admissibility."); <u>Riley v. Ford Motor Company</u>, 2011 WL 13079483 (S.D. Miss. 2011) ("assuming that state regulations concerning licensure of engineers are determinative as to the competency of expert testimony, Mississippi's licensure or certification requirement is inapplicable here, as it unreasonably burdens the Court's administration of its own rules regarding the admissibility of expert testimony."); <u>Emig v. Electrolux Home Products Inc.</u>, 2008 WL 4200988, *5 (S.D.N.Y. 2008) ("it is well-settled that, to be an expert, a person need not hold a particular degree or license...it is not uncommon for a person to qualify as an expert based on his or her experience alone.").

Moreover, Dr. Gwin does not have to have a degree specific to mechanical or biomechanical engineering to qualify as biomechanical expert for purposes of this case, as her general engineering knowledge resulting from her electrical engineering degree and professional experience qualifies her. The fact that her degree is in electrical engineering, rather than mechanical or biomechanical engineering, goes to the weight and credibility of her opinions, not admissibility. Indeed, the 10th Circuit and other Federal District Courts have consistently held that an engineering expert does not have to have a degree in a specific discipline to qualify under <u>Daubert</u>, where the totality of her experience, education and training provides the requisite knowledge.

In <u>Dillon</u>, *supra*, the 10th Circuit explained this principle. The plaintiff in <u>Dillon</u> argued the defendant's expert witness on the issue of large accidents and fires could not testify regarding the cause of the fire that caused the injuries claimed in the case, because he did not have a degree or educational background in structural engineering, architecture, fire protection engineering or fire investigation. Instead, the expert had a civil engineering degree. The Court found the expert was qualified due to the totality of his education, training

and experience in engineering and fire investigation, despite the lack of a degree or license specifically relating to structural engineering, architecture or fire investigation. The Court stated the following in this regard:

> King Soopers complains that Craddock is not qualified because his educational background is in civil engineering, and he is not an architect, structural engineer, fire protection engineer, or certified fire investigator. A person may be qualified "as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. R. 702; *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir.1990) (stating that an expert is qualified when he possesses "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for the truth") (internal quotation marks omitted). King Soopers cites no authority for its argument that only architects, structural engineers, fire protection engineers, or certified fire investigators can provide expert testimony regarding the origin of a fire. Our ruling in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227 (10th Cir.2004), which affirmed the admissibility of expert testimony from a fire investigator, a chemical engineer, and an accident investigator, is support for the district court's ruling in the present case. *See id.* at 1235.

> Further, Craddock was qualified as an expert under Rule 702. Craddock is a consulting engineer for Engineering Systems, Inc., which investigates accidents and fires. Craddock described his speciality as "the evaluation of very large fires." Aplee. App. at 121. For three years, Craddock investigated a fire at the MGM casino that spread rapidly from a restaurant where the sprinklers had been removed. In this case, Craddock's primary role was to determine why "this particular fire had got out of hand and spread so rapidly and ended up basically destroying this particular structure." *Id.* at 128. Craddock has an undergraduate degree in civil engineering, and he has taken additional courses in construction materials. Craddock has performed tests on construction materials, including fire testing involving different types of insulation, and evaluating the sufficiency of sprinkler and fire alarm systems. Craddock has experience in designing and evaluating sprinkler systems and interpreting building codes. He has testified as an expert in Colorado state and federal courts. King Soopers has not established that the admission of Craddock's expert testimony constituted plain error.

*Id.* at 756; *see also* <u>Lara v. Delta International Machinery Corp.</u>, 174 F.Supp.3d 719, 732 (E.D.N.Y. 2016) (finding that expert was qualified where he had education "in the field of engineering in general"); <u>Hilaire v. DeWalt Indus. Tool Co.</u>, 54 F.Supp.3d 223, 239-40 (E.D.N.Y. 2014) (finding that an expert did not have to have a degree or educational

background in a specific discipline of engineering to testify to design and manufacture issues involving mechanical engineering); Humphrey v. Diamant Board, Inc., 556 F.Supp.2d 167, 176 (E.D.N.Y. 2008) (expert's "generalized engineering education" combined with professional experience qualified him to testify about a specific product he had no prior experience with); Sprint Communications Co., L.P. v. Vonage Holdings Corp., 500 F.Supp.2d 1290, 1343-45 (D. Kan. 2007) (holding that a patent infringement expert in a telecommunications technology case was qualified even though he had no degree in electrical engineering, computer engineering or computer science).

Plaintiffs' focus on the specific discipline of Dr. Gwin's engineering degree ignores her full list of qualifications. She is a degreed engineer who is qualified to testify to biomechanical concepts because of the totality of her education, training and professional experience, including her electrical engineering degree and education, her years of experience in automotive engineering and safety testing at Ford and her training and experience as a biomechanical engineer employing the injury causation analysis method at BRC. Plaintiffs entirely ignore the totality of Dr. Gwin's education, training and professional experience in automotive engineering and biomechanical engineering, as well as her years of experience using the injury causation analysis method. The fact that her engineering degree is not specific to biomechanical or mechanical engineering goes to the weight and credibility of her opinion, not its admissibility.

Finally, Plaintiffs' argument that Dr. Gwin is not qualified in a medical sense because she does not specialize in spinal injuries is inaccurate. As explained previously, Dr. Gwin is a trained and experienced emergency physician and nurse. Her knowledge and skills gained through that education, training and experience make her perfectly qualified to testify about Plaintiffs' injuries, review their medical records, symptoms, reports, diagnoses and to

determine the cause of their injuries, regardless of the area of the body. An emergency room physician specializes in evaluating patient complaints, symptoms and reports and determining and identifying an injury following an accident. She does not have to be an expert in orthopedics or spinal injuries to do this, nor is she exceeding the bounds of her medical expertise to do so. Dr. Gwin is more than qualified to opine as to whether Plaintiffs' injuries were acute in nature. While an orthopedist would certainly be required to *treat* Plaintiffs' spinal injuries, an emergency room physician can certainly determine *whether or not an acute injury exists* following an accident. Without a doubt, Dr. Gwin possesses special knowledge as to the very matter on which she proposes to give an opinion–the evaluation of existence of an injury caused by an accident versus degenerative changes over time.

The cases Plaintiffs cite in support of their medical qualification argument are factually distinguishable from the circumstances in this case. In O'Conner v. Commonwealth Edison Co., 807 F.Supp. 1376 (C.D. Ill. 1992), the plaintiff claimed he sustained bilateral cataracts caused by radiation exposure at a nuclear power plant where he worked. He retained a general ophthalmologist who specialized in fitting contact lenses to testify that only radiation exposure could have caused his cataracts. The doctor had no experience whatsoever with radiation induced cataracts and had never studied or performed any research on anything relating to radiation exposure. The Court found he was therefore not qualified to testify that radiation exposure caused plaintiff's cataracts. In Smelser v. Norfolk S. Ry. Co., 105 F.3d 299 (6th Cir. 1997), the qualifications of the biomechanical expert *were not even at issue* and his opinion was excluded based upon his methodology. In Alfred v. Caterpillar, Inc., 262 F.3d 1083 (10th Cir. 2001), the issue was whether a mechanical engineer, who admitted he was not an expert in "human factors," could testify to the same. These cases are all

13

inapplicable to the instant case, and the issue of an emergency physician evaluating whether acute injuries existed following a low speed automobile accident.

Several of the cases Plaintiffs cite involve complex medical devices and expert witnesses who were physicians but had no experience with the specific medical device at issue, which has no bearing on this case. In Alexander v. Smith & Nephew, P.L.C., 98 F.Supp.2d 1310, 1315 (N.D. Okla. 2000), the issue was whether a family practice doctor was qualified to testify that a specific medical device was mechanically sound and did not contribute to the plaintiff's attainment of solid fusion and excessive scarring, fibrosis, and formation of hypertrophic bony overgrowth, nerve root damage, chronic pain and spinal disorders caused by the device. In Ralston v. Smith & Nephew, 275 F.3d 965 (10 th Cir. 2001), the 10th Circuit found that an orthopedic surgeon was not qualified to testify about product warnings on a medical device specifically dealing with the concept of intramedullary nailing, which the expert admitted she had no experience with.

**B.      Dr. Cynthia Day**

Dr. Day is a radiology expert who will testify regarding her review of Plaintiffs' medical imaging and related opinions in her report. [Doc. 31]. Dr. Day opines that, after reviewing Plaintiffs' imaging reports following the accident, there is no evidence of acute traumatic injury in Mr. Stiebens' cervical spine, thoracic spine and lumbar spine; rather, Dr. Day opines the imaging shows multilevel degenerative changes in all three areas. [Doc. 39-7].

Plaintiffs claim that Dr. Day, who is a Board Certified Radiologist, is not qualified to interpret Plaintiffs' imaging reports for their backs and necks following the accident, solely because she does not sub-specialize as a *neuro*radiologist. Without citing to any supporting legal authority whatsoever, Plaintiffs summarily conclude that a radiologist is not qualified

to interpret imaging of a person's back and neck. Defendant is unaware of, and Plaintiffs do not cite, any legal or scientific authority stating the interpretation of back and neck imaging requires a *sub*-specialist, which goes even further than a specialist. No sub-specialty is required to interpret imaging of the spine, back or neck and it is certainly not required for Dr. Day to fully evaluate this case. [Exhibit 2, Affidavit of Dr. Cynthia Day].

Dr. Day is Board Certified with the American Board of Radiology. [Doc. 39-5; Ex. 2]. She received her Doctor of Medicine from The University of Texas Health Science Center in 2002. Id. She completed her Residency in Diagnostic Radiology at the University of Texas Health Science Center and acted as Chief Resident. Id. She completed a Fellowship in Emergency Radiology, as well as mini-fellowships in neuroradiology and musculoskeletal radiology at Harvard University. Id. She also received a certificate of completion in Neuroradiology from the American College of Radiology in 2016, which requires accurate and confirmed evaluation of 100 cases. Id. She has worked as a Staff Radiologist, a Clinical Assistant Professor of Radiology and served as an Instructor at Harvard Medical School. Id. Dr. Day explains in her Affidavit that she routinely reads imaging studies of the spine in her clinical practice. Id. She has published articles and given presentations on the topics of radiology in acute and chronic neck pain cases, using imaging in determining injury causation, motor vehicle and accident reconstruction and radiological analysis in product liability litigation. Id.

Defendants' allegation that Dr. Day is not qualified, as a Board Certified Radiologist, to interpret back and neck imaging to identify acute injury is wholly unsupported by legal or scientific authority. Any argument that Dr. Day is not a *sub*-specialist in neuroradiology goes to the weight and credibility of her opinion, rather than its admissibility. Dr. Day is clearly generally qualified as a radiology expert by her education, experience and training. She is

likewise specifically qualified to interpret Mr. Stiebens' imaging studies in this case, specifically to look for evidence of acute injury. Plaintiffs claim that Mr. Stiebens' imaging is too "advanced" for Dr. Day's qualifications is not supported by any evidence. On the contrary, Dr. Day reviewed x-rays and MRIs, which fall completely within her field of practice as a radiologist.

### C.    Enrique Bonugli

Bonugli is an accident reconstruction and biomechanical expert who will testify regarding his review of the evidence concerning the accident; his investigation into the accident; his accident reconstruction, including the relevant speeds and forces described in his report; and his conclusions relating to the same. [Doc. 31]. Bonugli is highly qualified to render these opinions. He received his Bachelor of Science in Industrial Engineering from Marquette University in 2003, as well as his Master of Science in Biomechanical Engineering from the University of Texas Health Science Center in 2015. [Doc. 39-8]. Since 2003, Bonugli has gained extensive professional experience in biomechanical engineering as an Intern, Test Engineer, Senior Test Engineer, and now Technical Director at BRC. Id. He has been an Accredited Traffic Accident Reconstructionist since 2009.

Plaintiffs argue that Bonugli is not qualified to testify about anything relating to engineering, including his biomechanical opinions, accident reconstruction and investigation in this case, solely because he is not a licensed professional engineer. As set forth previously in the section relating to Dr. Gwin's qualifications, a professional license is not required for an engineering expert to qualify under Rule 702 and Daubert. Like Dr.Gwin, Bonugli does not hold himself out as a licenses Professional Engineer in this case and he states in his Affidavit that he is not rendering his opinions for the purpose of construction, design or analysis of a structure for occupancy, nor is he providing expert witness testimony

16

concerning those activities. [Exhibit 3, Affidavit of Enrique Bonugli]. Looking at Bonugli's education, training and experience, he is clearly qualified as an accident reconstruction and biomechanical expert.

**PROPOSITION II**

**DEFENDANTS' EXPERTS' OPINIONS ARE RELIABLE.**

After determining that Dr. Gwin, Dr. Day and Bonugli are qualified experts by their skill, experience, education, training and knowledge, the Court must assess whether their opinions meet the reliability standards set forth in Daubert and Kumho. The Daubert Court outlined certain *non-dispositive* factors relevant to the issue of reliability: (1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error associated with the theory or technique; and (4) whether the theory or technique has general acceptance. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993). Importantly, however, the test of reliability is flexible, and these factors therefore do not necessarily or exclusively apply to all experts or every case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). As for the factual basis, the law requires only that the expert's opinion have some basis in fact, "as opposed to conjecture or speculation [but] absolute certainty is not required." Keiffer v. Weston Land, Inc., 90 F.3d 1496, 1499 (10th Cir. 1996) (citing Jones v. Otis Elevator Co., 861 F.2d 655 (11th Cir. 1988); Robinson v. Mo. Pac. R.R. Co., 16 F.3d 1083 (10 th Cir. 1994)). Here, the methodologies employed by Dr. Gwin, Dr. Day and Bonugli in formulating their opinions all meet the reliability factors set forth in Daubert and Kumho; moreover, the opinions are based upon sufficient facts and evidence in this case.

A.    **Dr. Lisa Gwin**

In her report, Dr. Gwin explains in detail the facts, data, principles and methods used to form the basis of her opinions. First, Dr. Gwin reviewed numerous documents and evidence in the case. She reviewed the following: (1) the Oklahoma Traffic Collision Report; (2) Repair Estimate for 1997 Saturn SL1; (3) Repair estimate for 2011 Honda CRV; (4) Pleadings and Discovery Responses; (5) Depositions of Chad Johnson, Mary Stiebens and Christopher Stiebens; (6) Color photographs of the 2011 Honda CRV, the Accident Scene, Facebook and Instagram photos posted by Mr. Stiebens and the 1997 Saturn SL1; (7) Medical Records for Mr. Stiebens relating to the accident from approximately 15 different providers; and, Medical Records for Mrs. Stiebens relating to the accident from approximately eight different providers. [Doc. 39-2]. The medical records reviewed include records from first responders, emergency department, pain management, imaging and chiropractic.

Dr. Gwin also performed an Exemplar Surrogate Demonstration at BRC on July 6 and 9, 2018, using a closely matched exemplar vehicle and human surrogates matched to Plaintiffs for standing stature and weight. Both surrogates position the seat and seatbelt to reflect usual safe riding practices and positioned their arms on the arm rests. [Doc. 39-2]. An impact was simulated using the impact analysis results from Bonugli's testing. The result of the impact was that both surrogates were in an upright posture with the driver surrogate's head less than three inches from the head restraint and the passenger surrogate's head in contact with the head restraint. Id.

Dr. Gwin states in her report that this exemplar demonstration, along with the reviewed materials, Bonugli's impact and accident reconstruction analysis, Dr. Day's radiology review, current literature (cited in her report) and the laws of physics, provided her

the information she needed to perform injury causation analysis and conclude to a reasonable degree of medical and scientific certainty that "net spinal motion was within physiological limits." [Doc. 39-2, p. 7]. Dr. Gwin was also able to conclude that "the subject acceleration of .5-2.4 g was in the realm of everyday activities (e.g., dancing riding an elevator) and would not be expected to cause injury." Id. Dr. Gwin provides figures in her report with scientific data demonstrating head, thoracic and lumbar accelerations in everyday activities, to compare to the acceleration data for the subject accident. [Doc. 39-2, p. 8-9]. Dr. Gwin spends eight pages in her report going through her methods, research, review, findings and conclusions in scientific and medical detail and a 10-page bibliography of scientific literature she relies upon and cites is attached to the report.

In her Affidavit, Dr. Gwin further provides an in-depth detailed explanation of the injury causation analysis method she used in determining Plaintiffs' injury causation and arriving at her opinions, as well as how she applied it to the facts of this case. [Ex. 1, pp. 4-7]. The injury causation analysis method is not new or novel, nor did BRC create it. Id. It is the scientific method used to analyze the specific mechanism of injury for individuals who experience incidents in workplaces, transportation and other settings. Id. It involves comparing the mechanical forces involved in the incident with the body's injury tolerance. Id. It is a product of the Scientific Method, is subjected to peer review publication and is accepted by entities such as the Department of Defense, the Federal Aviation Administration, the National Transportation Safety Board and the National Highway Traffic Safety Administration. Id. Any minimal rates of error are addressed by Dr. Gwin in her Affidavit. Id. As such, the injury causation analysis method meets the four reliability standards set forth in Daubert and Kumho. Notably, Plaintiffs cite no legal or scientific authority stating that the

injury causation analysis method does not satisfy these four factors or that it is unreliable under Daubert.

The standard here is *sufficiency* and Dr. Gwin clearly shows that her opinion is based upon sufficient facts and data, as well as reliable scientific methods. Yet, Plaintiffs pick apart details of Dr. Gwin's report that go to the weight and credibility of the opinion, not admissibility. From an engineering perspective, Plaintiffs and their untimely identified expert witness, John Smith, **who likewise does not have an Oklahoma engineering license or a biomechanical engineering degree**, criticize Dr. Gwin for not going to the scene of the accident, taking any measurements, examining the vehicles, measuring the seat back position or incline, measuring the position of the headrest or the occupant spaces or inspecting the interior for anything indicating places where Plaintiffs' bodies may have impacted parts of the interior. Plaintiffs also criticize Dr. Gwin for not taking into account the surrogate occupants' resilience, constitution or predisposition to injury.

Although Dr. Gwin did not inspect the actual vehicle or go to the scene of the accident, she certainly reviewed *sufficient* information to employ the injury causation analysis and formulate an opinion. Dr. Gwin explains in her Affidavit that the injury causation analysis allows her to determine whether the claimed acute injuries were consistent with the forces experienced by Plaintiffs. [Ex. 1]. The forces were determined through standard accident construction methodologies and do not require hands-on inspection of the site or vehicles, where other sufficient evidence exists, as it does here. [Ex. 1]. Dr. Gwin's injury causation analysis considered the damage photographs, repair estimates and medical records of Plaintiffs and related them to the analysis. [Ex. 1]. Aside from Smith's Affidavit, Plaintiffs fail to provide any independent evidence that the reviewed information was not sufficient or

that going to the scene of the accident and inspecting the subject vehicle are required to perform injury causation analysis.

Ultimately, Smith's complaints about the sufficiency of the factual basis to support Dr. Gwin's opinion go to the weight of the opinion, not admissibility. Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 654 (10th Cir. 1991). Just because Plaintiffs and Smith do not agree with Dr. Gwin's opinions, or even with her method of arriving at those opinions, does not mean that Dr. Gwin's opinions are inadmissible. *See, e.g.,* McCoy v. Whirlpool Corp. (unpub.), 2003 WIL 1923016 at *6 (D. Kan. Apr. 21, 2003) (citing Kannakeril v. Terminix Int'l Inc., 128 F.3d 802 (3d Cir. 1997) for the proposition that "the fact that others may disagree with his conclusions is not sufficient to sustain a challenge under Daubert[, as] Daubert does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology"). Smith's affidavit, and the conclusory statements contained within it, are merely Plaintiffs asking the Court to believe their expert over Dr. Gwin, which is clearly not within the Court's legal gatekeeping function.

Plaintiffs further argue that Dr. Gwin's medical opinion that Plaintiffs' injuries are a result of degenerative changes over time, rather than one traumatic accident, is not based upon sufficient facts or data. Specifically, Plaintiffs state that Dr. Gwin did not examine Plaintiffs, did not review their complete medical histories nor did she consider occupant resilience, constitution or predisposition to injury. The fact that Dr. Gwin did not examine Plaintiffs or review their complete medical history does not render her opinion unreliable. She relied upon her review of Plaintiffs' medical records relevant to this accident, as well as reviewing the independent medical examination reports of Dr. Stephen Conner, who did physically examine both Plaintiffs. Defendants are unaware of, and Plaintiffs do not cite, any

legal authority requiring a medical expert to physically examine a plaintiff in order to make a written report and render an opinion. On the contrary, medical causation experts routinely rely upon medical records to formulate their opinions.

Plaintiffs also argue that Dr. Gwin's opinion is not reliable because she is not a radiologist and she does not specialize in spinal injuries. However, Dr. Gwin clearly states that she relied upon the expert impressions of Board Certified Radiologist, Dr. Day. [Doc. 392; Ex. 1]. Medical doctors frequently consult with and rely upon the impressions of radiologists in forming their opinions and such does not render Dr. Gwin's opinion cumulative or unreliable. [Ex. 1].

### B.     Dr. Cynthia Day

In her report, Dr. Day explains in detail the facts, data, principles and methods used to form the basis of her opinions. Specifically, Dr. Day reviewed Mr. Stiebens' imaging reports and studies from Toy Chiropractic, Comanche County Memorial Hospital, Oklahoma Diagnostic Imaging and Mercy Hospital Oklahoma City. [Doc. 39-7]. Plaintiffs argue that Dr. Day's opinions based upon these imaging reports are unreliable because (1) the imaging she reviewed were not the best quality of films, (2) she did not examine Mr. Stiebens and was not provided copies of his medical records, and (3) she did not discuss the MRI report from Mr. Stiebens' neurosurgeon in her report.

Dr. Day cannot control what is contained in Plaintiffs' imaging studies. And the fact that she did not examine Plaintiffs is entirely appropriate for a radiologist in interpreting imaging studies. [Ex. 2]. A radiologist giving an interpretive impression is supposed to read imaging studies in a "vacuum" without other medical records and without examining the patient. Id. Indeed, Dr. Day was not tasked with diagnosing Plaintiffs' condition; rather, she was to interpret the imaging studies provided to look for evidence of acute injury. A

differential diagnosis and physical examination would only be appropriate for a radiologist attempting to diagnose a patient's condition, which is not Dr. Day's purpose in this case. [Ex. 2]. The cases Plaintiffs cite relating to differential diagnosis all contain facts wherein a doctor gave an opinion as to a person's diagnosis. Such is not the case here, as Dr. Day was merely interpreting the existing imaging studies for evidence of an acute injury, which she was unable to find.

### C.   Enrique Bonugli

Bonugli also explains in detail the methodology, facts and data underlying his opinions in his report. Bonugli reviewed the following documents: (1) the Oklahoma Traffic Collision Report; (2) Repair Estimate for 1997 Saturn SL1; (3) Repair estimate for 2011 Honda CRV; (4) Pleadings and Discovery Responses; (5) Depositions of Chad Johnson, Mary Stiebens and Christopher Stiebens; (6) Color photographs of the 2011 Honda CRV, the Accident Scene, Facebook and Instagram photos posted by Mr. Stiebens and the 1997 Saturn SL1; (7) Medical Records for Mr. Stiebens relating to the accident from approximately 15 different providers; and, Medical Records for Mrs. Stiebens relating to the accident from approximately eight different providers. [Doc. 39-9]. Bonugli also performed an impact assessment and analysis based upon these materials, as well as scientific methodology explained in detail, including a damaged-based energy method and damaged-based crash simulation method. [Doc. 39-9; Ex. 3]. Bonugli cites published authority for each of these methods.

Plaintiffs argue that Bonugli's opinions are speculative, based upon facts not in evidence and on data summarily provided by Defendants and accepted without question by Bonugli. As with Dr. Gwin, Plaintiffs criticize Bonugli for not going to the site of the accident and not taking any photographs or measurements there. Plaintiffs also criticize Bonugli for not speaking with the investigating officer, shooting coordinates, determining

the line of site or the coefficient of friction. Yet, the information and methods that Bonugli relied upon are sufficient for an accident reconstruction under standard methodologies and there is no requirement for additional evidence. [Ex. 3].

Plaintiffs further state that Bonugli "back-tracked" his calculations to achieve a closing velocity to match his intended delta-v calculations, which is a misrepresentation of Bonugli's methodology, which includes an iterative process. Id. Bonugli explains in his Affidavit that, in an iterative process, simulation software allows the input of known data points to allow a recreation of the subject event to run through multiple simulations of the calculable physics of an event until the positions of the vehicles and their resulting damage matches the physical evidence from the event. [Ex. 3]. Bonugli's delta-v calculation is the product of this exact analysis. [Ex. 3].

Finally, as with Dr. Gwin, Plaintiffs cite the Affidavit of their expert John Smith, which merely disagrees with Bonugli and his methods. As explained previously, Smith's disagreement with Bonugli's opinions and methods is for the jury to weigh and consider at trial.

## CONCLUSION

For the reasons set forth in detail above, Defendants respectfully request that this Court deny Plaintiffs' Daubert Motion, as they fail to establish that Defendants' experts are unqualified or that their opinions are unreliable.

*s/Lane R. Neal*
Lane R. Neal, OBA #22246
Gerald E. Durbin, II, OBA #2553
David B. Donchin, OBA #10783
Durbin, Larimore & Bialick
920 North Harvey
Oklahoma City, OK 73102-2610
Telephone:  (405) 235-9584
Facsimile:  (405) 235-0551
dlb@dlb.net
Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

⊠ I hereby certify that on August 22, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David M. Nix, OBA #14894
The Nix Law Firm
1401 Holliday, Suite 400
Wichita Falls, TX 76301
Telephone: (940) 322-8200
Facsimile: (940) 228-3233
dnix@thenixlawfirm.com
Attorney for Plaintiffs

*s/Lane R. Neal*
Lane R. Neal

2315.0011\#17735008v1<OKC> -Response to Daubert Motion ABU FINAL